## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BOARD OF TRUSTEES, PLUMBERS AND      )
PIPEFITTERS  LOCAL  UNION  NO.  74   )
PENSION FUND, *et al.*,              )
                                     )
              Plaintiffs,      )      C.A. No. 1:20-cv-00194-TMH
                                     )
          v.                )
                                     )
JONES LANG LASALLE AMERICAS,         )
INC.,                                )
                                     )
            Defendant.       )


Timothy  J.  Snyder,  Curtis  J.  Crowther,  YOUNG  CONAWAY  STARGATT  &
TAYLOR, LLP, Wilmington, DE; Michael DelTergo, JENNINGS SIGMOND, P.C.,
Philadelphia, PA – Attorneys for Plaintiffs

Todd  D.  Schiltz,  Gregory  J.  Ossi,  Christopher  R.  Williams,  FAEGRE  DRINKER
BIDDLE  &  REATH LLP, Wilmington, DE – Attorneys for Defendant

## <u>MEMORANDUM OPINION</u>

June 8, 2023
Wilmington, DE

HUGHES, UNITED STATES CIRCUIT JUDGE, SITTING BY DESIGNATION:

Plaintiffs—Board of Trustees, Plumbers and Pipefitters Local Union No. 74 and several related multiemployer funds—sued Defendant—Jones Land LaSalle Americas, Inc.—for failing to pay amounts and contributions allegedly due to the funds, in violation of § 515 of the Employee Retirement Income Security Act, codified at 29 U.S.C. § 1145. Specifically, Plaintiffs allege that Defendant failed to make contributions based on "hours paid," in accordance with the terms of several collective bargaining agreements between Plaintiffs and Defendant. The parties dispute the meaning of the term "hours paid" in each of the relevant collective bargaining agreements. A bench trial was held in this matter and the parties submitted post-trial briefs in support of their respective positions. This Memorandum Opinion constitutes the court's Findings of Fact and Conclusions of Law as required under Federal Rule of Civil Procedure 52. The court finds that the record supports Plaintiffs' interpretation of "hours paid" by a preponderance of the evidence, and that Defendant is liable for any payments not made under the proper interpretation of "hours paid."

## I.    FINDINGS OF FACT

### A. The Parties

Plaintiff Local Union No. 74 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (Union) is an unincorporated labor union located in Delaware. Joint Stipulation of Facts (D.I. 37) at ¶ 3.

Plaintiff Plumbers and Pipefitters Local Union No. 74 Pension Fund (Pension Fund) is a pension trust fund established under 29 U.S.C. § 186(c)(5). *Id.* at ¶ 4. The

Pension Fund is a multiemployer plan within the meaning of 29 U.S.C. § 1002(37). *Id.* The Pension Fund is an employee pension benefit plan and an employee benefit plan within the meaning of 29 U.S.C. §§ 1002(2) and (3). *Id.*

Plaintiff Plumbers and Pipefitters Local Union No. 74 Annuity Fund (Annuity Fund) is a pension trust fund established under 29 U.S.C. § 186(c)(5). *Id.* at ¶ 5. The Annuity Fund is a multiemployer plan within the meaning of 29 U.S.C. § 1002(37). *Id.* The Annuity Fund is an employee pension benefit plan and an employee benefit plan within the meaning of 29 U.S. §§ 1002(237) and (3). *Id.*

Plaintiff Plumbers and Pipefitters Local Union No. 74 Welfare Fund (Welfare Fund) is a multiemployer plan within the meaning of 29 U.S.C. § 1002(37). *Id.* at ¶ 6. The Welfare Fund is an employee welfare benefit plan and an employee benefit plan within the meaning of 29 U.S.C. §§ 1002(1) and (3). *Id.*

Plaintiff Plumbers and Pipefitters Local Union No. 74 Scholarship Fund (Scholarship Fund) is a trust fund established under 29 U.S.C. § 186(c)(7). *Id.* at ¶ 7. The Scholarship Fund is an employee welfare benefit plan and an employee benefit plan within the meaning of 29 U.S.C. §§ 1002(1) and (3). *Id.*

Plaintiff Plumbers and Pipefitters Local Union No. 74 Apprenticeship Fund (Apprenticeship Fund) is a trust fund established under 29 U.S.C. § 186(c)(6). *Id.* at ¶ 8. The Apprenticeship Fund is an employee welfare benefit plan and an employee benefit plan within the meaning of 29 U.S.C. §§ 1002(1) and (3). *Id.*

The Pension Fund, Annuity Fund, Welfare Fund, Scholarship Fund, and Apprenticeship Fund (Funds) are governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA). *Id.* at ¶ 9.

Plaintiffs Plumbers and Pipefitters Local Union No. 74 Educational/PAC Funds (PAC) are unincorporated associations established under 2 U.S.C. § 431, et seq. *Id.* at ¶ 10.

Defendant Jones Lang LaSalle Americas, Inc. (JLL) is a commercial real estate company incorporated in Maryland with operations in Delaware. *Id.* at ¶ 1. JLL is a party to several collective bargaining agreements (CBAs) with the Union. *Id.* at ¶ 2.

B. <u>Facilities and Collective Bargaining Agreements</u>

The dispute in this case stems from several collective bargaining agreements between the Union and JLL at two different worksites. Union members engaged in facilities management services at two facilities overseen by JLL, the "Honeywell Facility" and the "JPMC Facility" as defined below.

    i.   <u>Honeywell Facility & CBAs</u>

JLL provides facilities management services to the facility in New Castle, Delaware owned by Honeywell International, Inc. (Honeywell Facility). Exs. D-7, D-8, D-9; D.I. 37. at ¶¶ 32–33. The Union is the exclusive bargaining agent for certain workers at the Honeywell Facility. D.I. 37. at ¶ 34.

JLL entered into a collective bargaining agreement with the Union for the Honeywell Facility on January 16, 2011 (2011 Honeywell CBA). Ex. J-3; D.I. 37. at ¶ 35. Under the 2011 Honeywell CBA, JLL is obligated to contribute specific sums

per "hour paid" to all the Funds except for the Market Recovery Fund, where contributions are made based on "hours worked." Ex. J-3 at 19; D.I. 37. at ¶ 37. The 2011 Honeywell CBA reads, in pertinent part:

> "[t]he Company will pay the employee an hourly wage rate and make contributions to the trust fund as per the Total Package wage sheet attached hereto and incorporated by reference as Exhibit A. . . The Company shall make contributions to the respective Funds *based on the hours paid* to bargaining unit members . . . ."

Ex. J-3 at 8 (emphasis added). The CBA also states: "[f]or each hour paid, or portion of an hour paid, the Company shall make the contribution to the respective Fund in such amounts as set forth in Exhibit A." Ex. J-3 at 9; *see also id*. at 19 (Exhibit A). This CBA was renewed under substantially the same terms for the calendar years 2013–2016 and again for calendar years 2017–2019 (collectively referred to as the 2017 Honeywell CBA). D.I. 37. at ¶¶ 36, 39.

The meaning of the terms "hours paid," "for each hour paid," or "hours worked" was not specifically discussed in bargaining over the 2011 Honeywell CBA or any of the subsequent CBAs. D.I 37 at ¶¶ 38, 40. However, at the time the Union organized the Honeywell Facility, JLL, who had reviewed the Honeywell CBA, understood that "hours paid" differed from "hours worked." Deposition of Mr. James Beckley, JLL Senior Finance Manager (Beckley Dep.)[1] 14:22–15:11, 20:7–21:3.

---

[1]      At the request of the parties, the court entered all cited deposition transcripts into evidence after the parties designated that they be moved fully into the hearing. Tr. 9:7–13.

ii.  J.P. Morgan Chase Facility & CBAs

JLL provides facilities management services to the facility owned by J.P. Morgan Chase (JPMC) in Newark, Delaware (JPMC Facility). D.I. 37. at ¶¶ 15–16. The Union is the exclusive bargaining agent for certain workers at the JPMC Facility. D.I. 37. at ¶ 18.

Prior to March 2014, the JPMC Facility was managed by Cushman & Wakefield. D.I. 37 at ¶ 19. Cushman & Wakefield and the Union signed a CBA on August 5, 2011 covering bargaining unit workers at the JPMC Facility (C&W CBA). Ex. J-1. The C&W CBA was effective from February 1, 2011 until January 31, 2015. D.I. 37. at ¶ 20. The C&W CBA included obligations to contribute to each of the ERISA Funds and the PAC and read in pertinent part: "[t]he Company agrees to make contributions to the [Fund] in the following amounts per hour for each hour that an employee is paid. All contributions to the [Fund] are based on hours paid." Ex. J-1 at 13–14.

On August 1, 2011, representatives of Cushman & Wakefield asked the Union to explain the "hours paid" and "per hour for each hour that an employee is paid" provisions in the C&W CBA. Trial Tr. (Tr.) 90:17–91:23. The Union explained the distinction  to Cushman & Wakefield with the following illustration: that forty hours of straight time and ten hours of overtime work represented fifteen hours paid for overtime and thus fifty-five hours paid overall. Tr. 94:2–10; Ex. P-2 at 18. After being advised how the Union (and Funds) interpreted this provision, Cushman & Wakefield consistently paid contributions in accordance with the "hours paid" provision in the

C&W CBA as understood by the Plaintiffs. Tr. 98:11–99:15, 102:8–15, 163:15–165:13, Ex. P-3 at 4–6, Ex. P-4 at 5. However, JLL was not a party to this conversation. Tr. 98:11–99:15, 102:8–15, 163:15–165:13.

JLL first became involved with the JPMC Facility in early 2012 by preparing a proposal to manage the JPMC Facility. Deposition of Mr. Scott Eckardt, Director for Global Critical Facilities for JLL (Eckardt Dep.) 13:24–14:12. JLL later entered into a facilities management agreement with JPMC for the management of the JPMC Facility (Master Agreement). D.I. 37 at ¶ 17. The Master Agreement provided for JLL to perform "due diligence" and required JLL to produce an initial budget that included labor costs. Ex. J-6 at 32, 36, 47; Beckley Dep. 17:1–15, 24:10–26:12; Eckardt Dep. 17:18–19:16. Labor costs for the budget were reported at "the individual employee level." Beckley Dep. 16:19-24.

On October 30, 2013, Mr. Anthony Papili, Business Manager for the Union, emailed Mr. Eckardt and provided Mr. Eckardt with copies of the C&W CBA. Ex. P-5; Tr. 99:17–101:3. JLL also conducted a financial analysis of the labor costs for the year prior to its assumption of the JPMC Facility's management. Ex. J-6 at 32, 44, 47; Eckardt Dep. 17:18–19:16, 28:16–29:4, 30:1–11. This included data on Cushman & Wakefield's labor costs for the JPMC Facility. Eckardt Dep. 18:11–19:16, 29:19–30:11.

On or about January 23, 2014, Mr. Eckardt sent a letter directly to Union members employed at the JPMC Facility to offer them employment with JLL under the same terms as they had with Cushman & Wakefield. Eckardt Dep. 43:8–44:3,

44:16–19; Ex. J-7. In this letter, Mr. Eckardt wrote that "JLL is not a successor under the current Cushman & Wakefield contract," but that "JLL intends to honor all the provisions of the Local 74 contract with Cushman & Wakefield, with the exception of several modifications" that are not relevant to this litigation. Ex. J-7.

On February 28, 2014, JLL and the Union began negotiations for a new CBA. D.I. 37 at ¶ 22; Ex. J-7. JLL took over on-site management of the JPMC Facility on or about March 2014. Ex. J-9 at 2. JLL hired thirteen of the sixteen members hired by Cushman & Wakefield, which it admitted constitutes substantially all Union members. Exs. P-4 at 6; Eckardt Dep. 43:8–44:3. Mr. Eckardt communicated to Mr. Papili JLL's willingness to "honor all of the provisions of the Local 74 contract with Cushman & Wakefield" that are relevant to this litigation. Ex. J-7; D.I. 37 at ¶ 22.

JLL and the Union entered into a CBA on May 16, 2014 for the remainder of the term of the 2011 C&W-JMPC CBA, which ended on January 31, 2015 (2014 JPMC CBA). D.I. 37. at ¶ 24; Ex. J-8. Under the 2014 JPMC CBA, JLL was obligated to contribute specific sums per "hour paid" to each of the ERISA Funds. Ex. J-8 at 12–14. The operative language in the JPMC CBA reads in pertinent part: "[t]he Company agrees to make contributions to the [Fund] in the following amounts per hour for each hour that an employee is paid. All contributions to the [Fund] are based on hours paid." Ex. J-8 at 13–14. There are no substantial differences between the relevant portions of the C&W CBA and the 2014 JPMC CBA. *Compare* Ex. J-1 at 13–14 *with* Ex. J-8 at 13–14.

JLL and the Union continued bargaining and entered into another CBA effective February 1, 2015 through January 31, 2019 (2015 JPMC CBA). D.I. 37. at ¶ 26. As with the 2014 JPMC CBA, the 2015 JPMC CBA includes the obligation to contribute to the ERISA Funds and the PAC and contains the terms based on "hours paid," "per hour paid" and "per hour for each hour paid." *Id.* at ¶ 27. The meaning and interpretation of the terms "hours paid," "per hour paid" or "per hour for each hour paid" were not raised or discussed in bargaining between JLL and the Union over the 2015 JPMC CBA. *Id.* at ¶ 28.

JLL and the Union later engaged in another round of bargaining and entered into a memorandum of agreement (2019 JPMC MOA). The 2019 JPMC MOA adopted the terms of the 2015 JPMC CBA unless otherwise specified. *Id.* at ¶ 29. The term of the 2019 JPMC MOA began on February 1, 2019 and ended on January 31, 2022. *Id.* at ¶ 29. The 2019 JMPC MOA did not modify JLL's obligation to contribute to the ERISA Funds and the PAC, and as such, the 2019 JPMC MOA contained the same obligation to pay into the Funds based on "hours paid," "per hour paid," and "per hour for each hour paid." *Id.* at ¶ 30. The meaning or interpretation of the terms "hours paid", "per hour paid" or "per hour for each hour paid" were also not discussed in bargaining between JLL and the Union over the 2019 JPMC MOA. *Id.* at ¶ 31.

C. <u>Administration of the Funds and Auditing Process</u>

The Funds are administered by a Board of Trustees composed of Union members and representatives selected from employers contributing to the Funds. *Id.*

at ¶ 11. There are an equal number of Union and employer Trustees (collectively, Trustees). *Id.*

Day-to-day operations of the Funds, including collection and record-keeping of employer contributions, were delegated to Zenith American Services, Inc. (Zenith), a third-party administrator that oversees the Funds. Tr. 57:15–23, 63:18–23. Zenith records all contributions received and hours reported by the employers. D.I. 37. at ¶ 13. The forms used by Zenith for employers to report hours and contributions ask the employer to report both "hours paid" and "hours worked." Ex. P-13; Tr. 58:5–60:17, 84:9–11. Mr. Scott Ernsberger is employed by Zenith, serves as a Client Service Executive for the Funds, and testified on behalf of Plaintiffs. Tr. 56:16–18. Mr. Ernsberger has 31 years of experience, and administers approximately forty multiemployer funds, including the Funds. Tr. 57:10–23; 61:16.

The Trustees verify that an employer has made all required contributions to the Funds by conducting periodic audits of the Funds. D.I. 37 at ¶ 14. The Trustees employ Novak Francella (Novak), an independent auditing firm, to perform employer audits. Ex. J-9; Tr. 24:4–6; 85:8–12. Ms. Marta Cooper is the auditor currently assigned to oversee the Funds' audits, with over 18 years of experience auditing employers on behalf of multiemployer funds. Tr. 21:18–22; 23:3–5. Ms. Cooper also testified on behalf of Plaintiffs.

When Novak conducts a payroll audit, the auditor examines the employers' books and records, including payroll records and employer contribution reports for the designated audit period. Tr. 25:24–26:8. The auditor also reviews the participant

reports from the Fund Office. Tr. 26:10–19. After an audit is concluded, Novak advises the employer of its general observations in an "exit interview."[2] Tr. 27:1–4. Novak subsequently sends the employer a report that outlines its findings and a cover letter, called a ten-day letter, that invites the employer to advise Novak within ten days of the date of the letter if the employer disagrees with the audit. Tr. 27:4–20. The employer is also requested to provide additional documentation to support its position. Tr. 27:17–28:9. Novak will evaluate any additional documentation received from an employer and revise its audit findings if warranted. Tr. 28:7–11.

   D. <u>The Contested Audits</u>

      i. <u>The Honeywell Audits</u>

   In 2013, Novak audited the Honeywell Facility for the period from January 16, 2011 through December 31, 2021 (2013 Honeywell Audit). On October 30, 2013, Ms. Cooper sent an exit interview to JLL. Ex. J-4. The exit interview for the 2013 Honeywell Audit advised JLL that:

> [t]here are Funds that are paid based on "hours paid" and some Funds on "hours worked". Hours Paid consist of all hours (regular, paid time off and [overtime] and [double time] hours at time and half and double time)[.] Hours Worked consist of straight time [hours] worked, no paid time off hours (unless the employee worked on a holiday)[.] The audit resulted in differences because contributions were being paid at straight time hours to all Funds. This means that paid time off hours were reported to the "hours worked" funds and if an employee worked over time or double time, their hours were not being reported at time and a half or double-time.

---

[2]   The "exit interview" is not an actual interview with the employer but is a document that is delivered to the employer giving notice as to the results of the audit. Tr. 50:13-16.

Ex. J-4. Consistent with Novak's audit procedures, a Novak representative subsequently sent the 2013 Audit report and ten-day letter to Mr. Beckley, the Senior Finance Manager at JLL, on November 19, 2013, further detailing these findings. Ex. J-5 at 8.

Mr. Beckley replied by email on December 13, 2013 and advised Novak that JLL did not agree with the audit findings. Ex. J-5 at 7–8; Beckley Dep. 28:11–20. In relevant part, Beckley stated that "Jones Lang Lasalle reports number of Hours Paid as number of Hours Worked which is consistent with the handling of all of our CBAs" and referenced the Honeywell CBA. Ex. J-5 at 8; Beckley Dep. 29:8–22. After reviewing the Honeywell CBA, Ms. Cooper explained that "[p]er this agreement, all hours are to be reported as hours paid except to the Market Recovery Fund (hours worked). This is how we performed the audit . . . ." Ex. J-5 at 6–7.

After additional email exchanges, Ms. Cooper provided the following comparison of "hours paid" and "hours worked":

- **Hours Paid** Funds (Building, Education, PAC, Welfare, Pension, Annuity, Apprentice, Scholarship Funds). Hours are to be reported as follows:
All holidays paid
All regular hours worked
OT hours are to be reported at time and a half (ex. 8hrs OT would equal 12 hours)
DT hours are to be reported at double time (ex. 8hrs DT would equal 16 hours)
Vacation hours – these hours are only due only after the first 80 allowable vacation hours per year (2 weeks)  which means if an employee was paid a total of 100 vacation hours in one year, only the last 20 hours would be due to the Funds. (This is a new rule established by the trustees of the Funds late last year)

- **Hours Worked** Fund (Market Recovery). Hours are to be reported as follows:
All regular hours worked
OT hours are to be reported as straight hours (ex. 8hrs OT would still be 8 hours)
DT hours are to be reported as straight hours (ex. 8 hrs DT would still be 8 hours)
Holiday hours are only due if the employee worked on the actual holiday.
Vacation hours are NOT due.

Ex. J-5 at 3–4. No one from JLL responded to this email, posed questions to Ms. Cooper or Zenith, or advised Ms. Cooper, Zenith or any of the Plaintiffs that it would

12

not agree to make contributions on the basis of "hours paid" as defined in Ms. Cooper's email. Tr. 46:19–47:3, 83:15–20, 121:10–16, 138:11–16, 213:17–214:1.

For the reasons discussed below, the Funds audited both the Honeywell and JPMC Facilities for the period of January 1, 2016 through September 30, 2018 (2018 Audits). This audit of the Honeywell Facility, dated October 23, 2018, showed that JLL underpaid contributions in 2016 by $1,451.67, in 2017 by $2,413.87, and in 2018 (through September 2018) by $3,023.95. D.I. 37. at ¶ 46. Ms. Cooper concluded that the cause of the delinquencies was, in part, because JLL did not report contributions on "hours paid" correctly because "the hours were not reported as hours paid, they were reported as hours worked . . . . They have to be reported at time-and-a-half for overtime." Tr. 35:15-22; D.I. 37 at ¶ 49; Exs. J-9, J-11.

ii.   The JPMC Audits

In 2016, the Funds conducted their first audit of the JPMC Facility for the period of March 1, 2014 through December 31, 2015. D.I. 37. at ¶ 43; Ex. J-9. The audit was initially completed on August 15, 2017 but later revised on June 12, 2018 (2017 JPMC Audit). Ex. J-9 at 3. The 2017 JPMC Audit report indicated that JLL underpaid net contributions in 2014 by $99,941.48 and in 2015 by $117,027.01. D.I. 37 at ¶ 44. The auditor found that a delinquency existed because, in part, "[c]ontributions were not reported on hours 'paid' correctly." Ex. J-9 at 3.

Zenith wrote to JLL on or about February 9, 2018 concerning the 2017 JPMC Audit and delinquency. Ex. J-10. On March 5, 2018, Marino Prodan, the Account Executive in charge of the JPMC relationship, replied to Zenith to dispute the audit

13

and demanded that Zenith rescind its delinquency demand. Ex. J-10. Mr. Prodan stated that:

> The auditor appears to believe that benefits for Overtime and Double Time hours paid should be reported at 1.5 and 2 times the actual hours. As an example, if an employee is paid $30 per hour and works 10 hours of overtime, JLL pays 10 hours at $45 per hour (overtime premium). The hours paid (10 hours in this example) would have been used to calculate benefits. There is nothing in the forms that instructs otherwise. JLL has provided details by employee of hours worked and paid since inception.

Ex. J-10.

The 2017 JPMC Audit delinquency was brought to the Trustees' attention at their meeting in April 2018. Tr. 138:11-23. The Trustees directed Novak to audit JLL again, and Novak audited both the Honeywell and JPMC Facilities for the period of January 1, 2016 through September 30, 2018, resulting in the 2018 Audit reports. D.I. 37 at ¶¶ 45, 47; Tr. 138:4-9; Exs. J-9 and J-11. The 2018 Audit of the JPMC Facility, dated November 29, 2018, showed that JLL underpaid contributions in 2016 by $112,716.76, in 2017 by $153,130.30, and in 2018 (through September 2018) by $108,089.05. D.I. 37. at ¶ 48. As with the 2018 Audit of the Honeywell Facility, the auditor concluded that the cause of the delinquencies shown on both 2018 Audits was, in part, because JLL did not "report contributions on hours 'paid' correctly" at either facility. D.I. 37 at ¶ 49; Ex. J-9 and J-11. Specifically, "the hours were not reported as hours paid, they were reported as hours worked . . . . They have to be reported at time-and-a-half for overtime." Tr. 35:18-22; D.I. 37 at ¶ 49, Exs. J-9, J-11.

These events led to the current dispute between the parties, regarding whether JLL failed to pay the full amount into the Funds that require contributions based on

14

"hours paid." At trial, Plaintiffs and Defendant put forth witnesses to testify regarding the meaning of "hours paid" as used in each of the relevant CBAs. The testimony is summarized next.

E. Credibility of Testimony Regarding "Hours Paid"[3]

The first of Plaintiffs' witnesses, Ms. Cooper, has been an auditor for 18 years. She testified at trial that she understood "hours paid" to account for overtime hours, such that one hour of overtime worked paid at one-and-a-half times counts as one hour worked, and 1.5 hours paid. Tr. 30:14-16. Ms. Cooper thoroughly described the process she undertook to conduct the audits at issue, including how she communicated the results of the audit to JLL. Tr. 37:3-46:23. As the auditor responsible for applying the terms of the CBAs to JLL's contributions, Ms. Cooper's understanding of "hours paid" is both relevant and persuasive.

Similarly, Plaintiffs' witness, Mr. Ernsberger, also testified as to his understanding of "hours paid." Mr. Ernsberger was responsible for overseeing the Funds as a third-party administrator, including contribution accounting, trust accounting, determining eligibility for benefits, and payment of benefits, among others. Tr. 57:18-23. Mr. Ernsberger testified that "hours paid means that for overtime pay that will say time-and-a-half, the correspondent contribution to the

---

[3]     At trial, the court excluded Exhibit P-19 based on JLL's objection to this exhibit for lack of foundation and authentication. The findings of fact with regard to the interpretation of "hours paid" are made without reference to this exhibit. The court grants JLL's emergency motion under Rule 37(c).

benefit funds is also paid at time-and-a-half." Tr. 61:14-23. This is consistent with the trial testimony of Plaintiffs' witnesses.

In addition, two of the Trustees, Mr. Papili and Mr. Michael Hackendorn, also testified to their understanding of "hours paid." Mr. Papili is a Union member and trustee of Pension and Annuity Funds, and he was responsible for handling the CBAs and overseeing the contributions to the Funds. Mr. Hackendorn is also a union member who served as a trustee for the Pension and Annuity Funds. Mr. Papili testified that "hours paid" means "the straight time hours that you work in any one week, plus the overtime hours that you work, which gives you your total hours paid for that particular week." Tr. 88:18-23. Mr. Hackendorn also testified that contributions based on "hours paid" would include the additional hours for overtime, such that "two [overtime] hours at time-and-a-half will be three hours [paid]." Tr. 135:1-6. The testimony of both Mr. Papili and Mr. Hackendorn is consistent with the trial testimony of Ms. Cooper and Mr. Ernsberger. That Ms. Cooper, Mr. Ernsberger, Mr. Papili, and Mr. Hackendorn – four witnesses who this court found to be reliable and who worked with the CBAs and the Funds – all testified to a consistent meaning of "hours paid" is both relevant and persuasive.

Not only is each of Plaintiffs' witness's testimony consistent with each other, but the testimony provided by Ms. Cooper, Mr. Ernsberger, Mr. Papili, and Mr. Hackendorn is also consistent with the exhibits produced by the parties. As Ms. Cooper confirmed at trial, JLL confirmed during the audits that it "reports number of Hours Paid as number of Hours Worked," which is what prompted

Ms. Cooper to explain the difference between the two. Ex. J-5 at 4–5. This excerpt from February 2014, taken from emails between Ms. Cooper and Mr. Beckley, demonstrates how thoroughly Ms. Cooper explained the difference between "hours paid" and "hours worked" to Mr. Beckley during the 2013 Honeywell Audit:

> - **Hours Paid** Funds (Building, Education, PAC, Welfare, Pension, Annuity, Apprentice, Scholarship Funds). Hours are to be reported as follows:
> All holidays paid
> All regular hours worked
> OT hours are to be reported at time and a half (ex. 8hrs OT would equal 12 hours)
> DT hours are to be reported at double time (ex. 8hrs DT would equal 16 hours)
> Vacation hours – these hours are only due only after the first 80 allowable vacation hours per year (2 weeks)  which means if an employee was paid a total of 100 vacation hours in one year, only the last 20 hours would be due to the Funds. (This is a new rule established by the trustees of the Funds late last year)
>
> - **Hours Worked** Fund (Market Recovery). Hours are to be reported as follows:
> All regular hours worked
> OT hours are to be reported as straight hours (ex. 8hrs OT would still be 8 hours)
> DT hours are to be reported as straight hours (ex. 8 hrs DT would still be 8 hours)
> Holiday hours are only due if the employee worked on the actual holiday.
> Vacation hours are NOT due.

Ex. J-5 at 4. This exhibit also shows that JLL never challenged, or even addressed, Ms. Cooper's understanding of "hours paid" and "hours worked." The fact that documentary evidence confirms the trial testimony of Plaintiffs' witnesses further corroborates the evidence in support of Plaintiffs' interpretation. Together, the testimony presented by Plaintiffs and the corroborating documentary evidence suggests that it was known among those who work with CBAs that "hours paid" included both straight hours worked *and* any overtime or double time.

On the other hand, JLL presented only one witness at trial to support its own interpretation of "hours paid." Ms. Lorelai Reynolds, Senior Finance Manager at JLL, testified regarding JLL's interpretation of "hours paid." She asserted that "hours paid" means "hours paid that an employee worked, plus anything like bereavement,

jury duty, [and paid time off]," without any additional contributions for overtime or double time hours. Tr. 176:23-177:1. Ms. Reynolds also testified that "hours worked" means "[h]ours an employee physically works at their location," which does not include jury duty, bereavement, or paid time off. Tr. 195:8-15. When asked how overtime hours were factored into the calculation for "hours paid," Ms. Reynolds explained that "[i]f an employee works 10 hours of overtime, the employee gets paid 10 hours . . . if an employee works 10 hours and earns $30 an hour, the employee is paid . . . 10 hours at $45 an hour [for overtime]," meaning overtime does not change the "hours worked," but instead increases the hourly rate  Tr. 187:9-14.

After considering the relevant testimony from all witnesses alongside the relevant documentary evidence, the court concludes that the Plaintiffs' witnesses are more credible than the Defendant's witness. The court finds Ms. Cooper's testimony to be particularly credible and persuasive, based on her extensive experience with bargaining agreements in this industry, as well as her demeanor on the stand. Plaintiffs have provided considerable evidence in support of their interpretation of "hours paid," including consistent testimony from four separate individuals who worked with the relevant CBAs and documentary evidence that confirms that testimony. Although Ms. Reynolds is a reliable witness, her testimony is not as credible as that of Ms. Cooper, Ms. Ernsberger, Mr. Papili, or Mr. Hackendorn because it is not supported by any documentary evidence. First, Ms. Reynolds's professional experience, compared to Ms. Cooper's experience, is very limited. Furthermore—and perhaps most importantly—nowhere in the record does it say that

"hours paid" means hours worked plus jury duty, bereavement, and paid time off. In fact, JLL does not even reference Ms. Reynolds's testimony in its discussion of "hours paid," and only says that "JLL and [the Union] did not intend . . . to contribute at a higher rate for overtime and double-time hours." D.I. 70 at 32. But Ms. Reynolds never referred to any overtime or double-time "rates" in her testimony. Not only is Ms. Reynolds's testimony not corroborated by any other evidence in the record, but it is inconsistent with some of the documentary evidence. For example, Ms. Reynolds's testimony is inconsistent with JLL's correspondence during the audits. JLL represented during the audits that it "reports number of Hours Paid as number of Hours Worked," without any reference to jury duty, bereavement, or paid time off. Ex. J-5 at 8. If Ms. Reynolds's interpretations of "hours paid" and "hours worked" were adopted, JLL's statement in Ex. J-5 would suggest that JLL has been intentionally under-reporting any hours attributable to jury duty, bereavement, and paid time off. Ms. Reynolds's testimony is also inconsistent with her own communications. In an email to Mr. Beckley regarding the JPMC Audit, Ms. Reynolds specifically said that "[the auditors] interpret 'hours paid' as being 1.5 times the hours instead of the way JLL pays its employees (1.5 times the rate)." Ex. P-17. Once again, there is no mention of adding jury duty, bereavement, or paid time off to the calculation of "hours paid," and instead refers to a separate overtime rate.

Therefore, the court finds that Ms. Reynolds is not as credible of a witness as Ms. Cooper, Mr. Ernsberger, Mr. Papili, or Mr. Hackendorn because Ms. Reynolds's testimony is not supported by any other evidence in the record. As such, the court

credits the testimonies of Ms. Cooper, Mr. Ernsberger, Mr. Papili, and Mr. Hackendorn as persuasive evidence in support of Plaintiffs' interpretation of "hours paid."

## II.   <u>DISCUSSION AND CONCLUSIONS OF LAW</u>

As described above, the parties dispute the meaning of "hours paid," and the meaning of "hours paid" will determine whether JLL failed to appropriately contribute to the Funds that require contributions on the basis of "hours paid." First, the parties dispute whether "hours paid" is an ambiguous term subject to multiple reasonable interpretations. Second, in the event that "hours paid" is an ambiguous term, the parties dispute whether "hours paid" includes additional hours for overtime or double time work. Accordingly, the court first considers whether "hours paid" is an ambiguous term in the CBAs. Next, the court considers whether the record supports Plaintiffs' or JLL's interpretation of "hours paid."

### A.   <u>Legal Standards</u>

Section 515 of ERISA, codified at 29 U.S.C. § 1145, requires "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement" to "make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. To prevail, Plaintiffs must prove that the employer failed to pay in violation of the terms and conditions of the parties' collective bargaining agreement. *Laborers' Int'l Union of N. Am. Loc. No. 199 Welfare, Pension, Apprenticeship & Training, Annuity & Laborers-Emps. Coop. Educ. Tr. Funds of De.,*

20

*Inc. v. Ramco Sols.*, No. 11-4976, 2013 WL 4517935, at *4 (D.N.J. Aug. 26, 2013). Plaintiffs therefore bear the burden of demonstrating by a preponderance of the evidence that JLL failed to contribute to the Funds according to the terms of the relevant CBAs.

Although federal law governs the construction of collective bargaining agreements, traditional rules of contract interpretation apply when not inconsistent with federal labor law. *Teamsters Indus. Emplys. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993); *see also Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456 (1957); *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991). Furthermore, where, as here, the "court is called on to interpret a [CBA,] it is generally appropriate for the court to look beyond the face of the [CBA]." *S.E. Penn. Transp. Auth. v. Brotherhood of R.R. Signalmen*, 882 F.2d 778, 784 (3d Cir. 1989). For example, the court may "consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence offered in support of that meaning." *Sheet Metal Workers*, 949 F.2d at 1284 (quotation marks omitted) (quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980)).

Accordingly, the court first considers whether "hours paid" is ambiguous, and then determines whether the record supports Plaintiffs or JLL's interpretation of "hours paid."

### B. "Hours Paid" is Ambiguous

A term in a contract is ambiguous if it is susceptible to multiple reasonable interpretations. *Teamsters Indus. Emplys. Welfare Fund*, 989 F.2d at 135. Further, "if a reasonable alternative is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the factfinder." *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 95 n.1 (3d Cir. 1992) (quoting *Mellon Bank*, 619 F.2d at 1011). However, the terms of a collective bargaining agreement are not ambiguous "merely because the parties to the contract disagree" as to the scope of terms in dispute. *L.P.P.R., Inc. v. Keller Crescent Corp.*, 532 F. App'x 268, 274 (3d Cir. 2013) (nonprecedential). Rather, the court considers whether "reasonable minds could differ as to the contract's meaning." *Id.*

Plaintiffs argue that "hours paid" is ambiguous because the parties clearly have two different, and reasonable, alternative interpretations of the term. D.I. 69 at 19–20. Plaintiffs claim that their interpretation of "hours paid" is reasonable because its interpretation was "understood by the other contributing employers, the auditor, the administrator, other unions, and even [JLL]." *Id.* JLL argues that "hours paid" is not ambiguous because "the relevant CBAs do not set a separate, higher rate for overtime or double-time hours." D.I. 70 at 28. JLL further argues that Plaintiffs' argument is unreasonable because it is "contrary to the industry standard interpretation.' *Id.* at 29.

22

The court finds that both parties had reasonable interpretations of the term "hours paid," and thus "hours paid" is an ambiguous contract term. The plain language of the bargaining agreements reasonably supports both parties' interpretations of "hours paid." *E.g.* Ex. J-01 at 12–14; Ex. J-03 at 8, 19; Ex. J-07. The parties also do not dispute that they did not explicitly discuss the interpretation of "hours paid" when negotiating any of the CBAs at issue. Plaintiffs have provided ample evidence in support of their interpretation of "hours paid." For example, Ms. Cooper—who, as the auditor, was responsible for applying the terms of the CBAs to JLL's contributions—testified that "hours paid" in the CBAs meant "[f]or each hour that an employee receives pay." Tr. 30:8–13. Specifically, Ms. Cooper distinguished "hours paid" and "hours worked" in her testimony, explaining that "if one person works one hour overtime, they are actually working the one hour, but they are getting paid for one-and-a-half." Tr. 30:10–13. Mr. Ernsberger's testimony reflected the same understanding of "hours paid." Tr. 61:11–62:6. In addition, Plaintiffs have provided evidence demonstrating that JLL was aware of this interpretation. *See, e.g.*, Ex. J-10 ("The auditor appears to believe that benefits for Overtime and Double Time hours should be reported at 1.5 and 2 times the actual hours.").

JLL has also provided some evidence supporting its interpretation of "hours paid." For example, Ms. Reynolds testified based on her experience working with the JPMC CBAs that "hours paid" means "hours paid that an employee worked, plus

anything like bereavement, jury duty,[and paid time off]," without any additional contributions for overtime or double time hours. Tr. 176:21–177:1.[4]

After considering this testimony and the corresponding findings of fact, the court concludes that the term "hours paid" is ambiguous because both Plaintiffs and JLL had a reasonable interpretation of the term "hours paid" and have provided evidentiary support for those interpretations, as discussed above.

C. "Hours Paid" has the Meaning Ascribed to it by Plaintiffs

When a contract term is found to be ambiguous, the court must attempt to discover what the contracting parties intended the clause to mean. *Rolls-Royce Motor Cars, Inc.*, 989 F.2d at 136. The court is permitted to consider extrinsic evidence when attempting to determine the proper interpretation of the ambiguous phrase, which "may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning." *Rolls-Royce Motor Cars, Inc.*, 989 F.2d at 136; *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 96 (3d Cir. 1992) ("In interpreting an ambiguous ERISA plan, a court may consider the intent of the plan's sponsor, the reasonable understanding of the beneficiaries, and past practice, among other things.").

Based on the findings of fact as described above, including the credibility determinations related to the testimony about the term "hours paid," this court finds

---

[4]   The court notes that Ms. Reynolds's testimony is not supported by any other evidence in the record, and as discussed above, Ms. Reynolds's testimony is not as credible as Plaintiffs' witnesses. Nevertheless, her testimony is relevant and based on her experience working directly with a subset of the CBAs and is enough to support a finding that JLL's interpretation is at least reasonable.

that the record supports Plaintiffs' interpretation of "hours paid," including the testimonial evidence presented at trial, the documents provided by the parties, and the dealings of the contracting parties. "Hours paid" therefore includes the sum of straight hours worked (1) and all additional hours for overtime (1.5) and double time work (2). For example, as explained in Ms. Cooper's correspondence, eight hours of overtime would count as twelve hours paid, and eight hours of double time would count as sixteen hours paid. Ex. J-5 at 4. On the other hand, eight hours of overtime, or eight hours of double time, would still count as eight "hours worked." Ex. J-5 at 4. The record also shows that JLL had reason to know of Plaintiffs' interpretation of "hours paid" but never meaningfully sought to correct that interpretation, and JLL assumed the terms of the C&W CBA, including contributions in accordance with Plaintiffs' interpretation of "hours paid."

     i.   <u>JLL Had Reason to Know of Plaintiffs' Interpretation of "Hours Paid"</u>

The court first considers whether JLL knew or had reason to know of Plaintiffs' interpretation of "hours paid." "Parties to a collective bargaining agreement are conclusively presumed to have equal bargaining power, and union agents have no duty to explain to employers the terms, conditions, or consequences of a collective bargaining agreement." *Emp. Painters' Tr. v. J & B Finishes*, 77 F.3d 1188, 1192 (9th Cir. 1996). "If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true *if he had reason to know* what the other party intended . . . it is not necessary that the party *actually know* the other party's intent; it is enough that he had 'reason to know'" the

25

other party's intent. *Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770, 775* (3d Cir. 1972) (cleaned up); *Mayer v. Dev. Corp. of America*, 541 F. Supp. 828, 852–53 (D.N.J. 1981).

The parties dispute whether JLL knew or had reason to know of Plaintiffs' interpretation of "hours paid" during the negotiation of any of the CBAs. The court determines that JLL had reason to know of Plaintiffs' interpretation of "hours paid" for at least the 2014 JPMC CBA, 2015 JPMC CBA, 2017 Honeywell CBA, and the 2019 JPMC MOA. The record shows that JLL was aware of Plaintiffs' interpretation of "hours paid" based on the communications between the parties as well as the due diligence conducted by JLL prior to the 2014 JPMC CBA, all of which took place either simultaneously with or before negotiations for these four CBAs.

There is no dispute that JLL conducted due diligence before JLL took over the JPMC Facility from Cushman & Wakefield. *See generally* Ex. J-6. This due diligence included looking into labor costs as part of determining an annual budget. As Mr. Beckley testified during his deposition, labor costs for the budget were reported at "the individual employee level," meaning JLL would have had information regarding the contributions made for each individual employee. Beckley Dep. 16:19–24. From conducting this due diligence, JLL should have recognized how "hours paid" was being interpreted based on how Cushman & Wakefield was making contributions. In addition, the parties do not dispute that the terms of the 2014 JPMC CBA, 2015 JPMC CBA, and 2019 JPMC MOA, were virtually unchanged from the terms of the

C&W CBA, showing the parties intended to adopt the same interpretations of the terms used in the C&W CBA.

Furthermore, JLL should also have recognized how Plaintiffs were interpreting "hours paid" during the course of the 2013 Honeywell Audit, which took place simultaneously with negotiations for the 2014 JPMC CBA and before negotiations concluded for the 2015 JPMC CBA, the 2017 Honeywell CBA, and the 2019 JPMC MOA. As discussed above, the emails between Ms. Cooper and Mr. Beckley from February 2014 (including the excerpt provided in the previous section) demonstrates how thoroughly Ms. Cooper explained the difference between "hours paid" and "hours worked." Ex. J-5 at 4. This exhibit also shows that JLL never challenged, or even addressed, Ms. Cooper's understanding of "hours paid" and "hours worked."

Finally, in an email to Mr. Beckley during the JPMC Facility audits, Ms. Reynolds specifically said that "[the auditors] interpret 'hours paid' as being 1.5 the hours instead of the way JLL pays its employees (1.5 times the rate)." Ex. P-17. When asked about this during trial, Ms. Reynolds stated that, while she did not agree with Plaintiffs' interpretation of "hours paid," she did understand this interpretation. Tr. 212:6–11.

The court is unpersuaded by JLL's argument that this argument "goes both ways" and that "[the Union] was equally on notice of *JLL's* contrary interpretation of 'hours paid' when it negotiated the 2014 JPMC CBA." D.I. 70 at 34. There is no evidence in the record that Plaintiffs were aware that JLL considered "hours paid" to

mean hours worked plus jury duty, bereavement, and paid time off. And as discussed above, there is no record evidence *at all*, other than Ms. Reynolds's testimony, supporting JLL's interpretation of "hours paid" or that Plaintiffs should have—or even could have—been aware of that interpretation.

JLL's due diligence prior to the 2014 JPMC CBA, as well as Ms. Reynolds's communications and testimony demonstrates that, at a minimum, JLL had reason to know of Plaintiffs' interpretation of "hours paid" for the 2014 JPMC CBA, the 2015 JPMC CBA, the 2017 Honeywell CBA, and the 2019 JPMC MOA. Because JLL had reason to know of Plaintiffs' interpretation of "hours paid" for a majority of the CBAs, yet never discussed or challenged this interpretation with Plaintiffs, this further determines that "hours paid" had the meaning ascribed to it by Plaintiffs.

### ii.   JLL Assumed the Terms of the C&W CBA Including "Hours Paid"

The court next considers whether JLL assumed the terms of the C&W CBA, including Cushman & Wakefield's interpretation of "hours paid," either by its role as a successor employer or based on its obligation to maintain the terms of the C&W CBA during negotiations for a new CBA. The court concludes that JLL assumed the terms of the C&W CBA, including Cushman & Wakefield's interpretation of "hours paid," which is the same as Plaintiffs' interpretation. In so concluding, the court need not reach the issue of whether JLL was a successor to C&W.

Even though JLL expressly stated that it was not a successor, JLL nevertheless agreed to "honor all the provisions of the [C&W CBA]" with a few minor modifications. Ex. J-7. This is enough to determine that JLL intended to assume the

28

terms of the C&W CBA. JLL also did not "convey its intention to set its own terms and conditions rather than adopt those of the previous employer," *First Student, Inc.*, 935 F.3d at 619, but expressly agreed to honor the terms of the C&W CBA other than those identified in the letter. Although JLL might have stated that it was not a successor to Cushman & Wakefield, it nonetheless agreed to honor most of the terms of the C&W CBA and by hiring substantially all the Union members previously employed by Cushman & Wakefield.

Furthermore, JLL's argument that the C&W CBA expired when JLL assumed management of the JPMC Facility is unpersuasive. As Plaintiffs responded, "[w]hen a CBA expires without a new agreement having been reached, the employer must continue to bargain in good faith for a new agreement and maintain the status quo during negotiations." *Mail Contractors of Am. v. N.L.R.B.*, 514 F.3d 27, 31 (D.C. Cir. 2008). Here, the "status quo" included continuing to make contributions in accordance with the C&W CBA. As explained above, JLL would have been aware of how Cushman & Wakefield was contributing to funds—including its interpretation of "hours paid"—based on the due diligence it carried out under the Master Agreement. Ex. J-6 at 32, 47; Beckley Dep. 17:1–15, 24:10–26:12; Eckardt Dep. 17:18–19:16. As such, based on the actions taken by JLL, including its clear statement to honor the relevant terms of the C&W CBA, JLL assumed the terms of the C&W CBA. This is relevant because, as explained in the court's Findings of Fact, the portions of the C&W CBA that are relevant to this litigation were carried over into the 2014 JPMC CBA and the 2015 JPMC CBA without any substantial modifications. Accordingly,

the meaning of "hours paid" is consistent across all of the CBAs that incorporate the relevant terms of the C&W CBA.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, the court finds that the correct interpretation of "hours paid" is the interpretation put forth by Plaintiffs, specifically that "hours paid" includes both straight hours worked, and additional hours for overtime and double time work. Under the proper definition of "hours paid," one hour of overtime paid at time-and-a-half would constitute 1.5 hours paid, and one hour of overtime paid at double time would constitute two hours paid. To the extent that JLL's contributions do not reflect this interpretation of "hours paid," JLL is liable for underpayments to each of the Funds that require contributions based on "hours paid." The court further finds that JLL is liable for any underpayments to each of the Funds that require contributions based on "hours paid," where payments were not made based on the proper interpretation of "hours paid." The parties are directed to provide to the court a stipulation as to damages in accordance with this opinion within 30 days of the date of this opinion.